Welcome everyone to the 4th Circuit this morning. It's good to have you here and we look forward to hearing your cases. This is number 22, first case, number 22-1280, Coalition for TJ v. Fairfax County School Board. Mr. Varelli, good to have you with us, sir. Good morning and may it please the Court. I am Don Varelli for the Fairfax County School Board. The admissions policy that the Board adopted for Thomas Jefferson High School is constitutional. It is 100 percent race neutral in design. There are no quotas, no targets, no racial preferences of any kind, no racial classifications of any kind. And it is 100 percent race blind in its administration. No application contains any racially identifying information, so all applicants are judged on a race blind basis. The policy reflects no intent to discriminate against Asian Americans or anyone else. There is no such evidence and the Coalition does not contend otherwise. Even if one grants the Coalition its characterizations of all the evidence on which it relies, and much of it is mischaracterized, but even granting those characterizations, even attributing to the Board as an official matter statements by the superintendent and statements by individual Board members, all you have is an expression by the Board that it had a purpose to increase opportunities for African American and Latino students to gain admission to TJ, groups who had been historically underrepresented. There is nothing unconstitutional about that purpose, so long as it is pursued through race neutral, race blind means, and that is exactly what the Board did. Even if this Court is persuaded by the argument that racial balancing to match the demographics of your area, for its own sake, is constitutional, say the Court is persuaded by that, but isn't there still a need for the Board to make a decision? Is there still evidence that the Coalition claims shows an intent to discriminate against Asian American students? Don't we still have to construe the facts in the light most favorable to the Coalition and draw inferences in their favor on that? On that sort of secondary purpose, even if the Court agrees with you that balancing for its own sake, fine, not unconstitutional. There are still text messages, pie charts, and there is a lot of argument in your brief about how to construe those things. You disagree with the Coalition about that, but don't we have to draw inferences in their favor when we are considering summary judgment for you? I think it goes back, I will answer your Honor's question directly, but I do think it needs to be framed. I also want to circle back to the racial balancing issue, but I will go directly to your Honor's precise question first. In terms of summary judgment for us, our cross motion, you are correct about the way to draw inferences, but all of that evidence establishes, all it establishes is an intent to increase the opportunities for African American and Latino students. There is no evidence of any animus against Asian American students. If you look at page 56 of their brief, they concede that on page 56. They say, yes, it is true, there is no smoking gun, but you wouldn't expect a smoking gun. The point here is that there is a much broader context than that. We didn't say just that there is no smoking gun evidence, we said there is no evidence, period. They didn't point to any evidence about discrimination directed at Asian Americans. There are text messages about how this will affect Asian American students, and you tell me I should read them to mean the board members were concerned, there were solicitous, they didn't want to have that impact, but the Coalition says, look, it shows they knew it was going to do that and they went ahead with it anyway. Is that a dispute of fact or law? Whether it is a dispute of fact depends on the legal standard that one applies. We think if you apply the correct legal standard, you look at what the board did. I will just draw the court to the board's resolution, which is at page 624, where the board's resolution says, we are not engaging in racial balancing, we are not engaging in racial targeting, we are not doing anything of the kind. If you look at the way the plan is implemented, I will say I do think that if one actually looks at the statements, there really are serious mischaracterizations. That is an example. There is also a dispute about what did the board mean by diversity? You would have us look at the pie charts that break students down by race and then have underneath it little figures about other groups of students. You would have us look at that and say it wasn't about race, it was about something else. The Coalition says, no, you need to say it is about race. Again, that is a dispute of fact that I think prevents us from granting summary judgment in your favor. That is a big ask. Respectfully, Your Honor, I disagree with it. I think it is a perfectly reasonable ask on this record because getting back to what the legal standard is, under Feeney, they have to show that the board acted because it wanted to discriminate against Asian Americans. That is the test they have to meet under the Equal Protection Clause. It has nothing to do with racial balancing or anything else. That is the test they have to meet. Mr. Verli, I sort of feel like the discussion between the parties about the question of racial balancing is sort of like two ships passing in the night. I think part of the problem is that you are both using that term to mean totally different things. Can you tell me what is your client's definition of racial balancing that you think the court needs to apply here? I think you are exactly right, Your Honor, in that we apply different definitions of that term. I think it is critically important. I appreciate the focus on it. Our understanding of racial balance is the Supreme Court's understanding of racial balance as defined in Fisher and in other cases, which is setting specified percentages for each racial group and then trying to achieve those targeted specified percentages. That is what the district court claimed we did. The district court said there was racial balancing. Right. Racial balancing defined in this way. Was that an error of law or fact or both? It is both. It is an error of law because the ships passing in the night, their definition of racial balancing is any consideration, any purpose to increase opportunities for any particular underrepresented racial group in a zero-sum environment. That is their definition of racial balancing. That is not the Supreme Court's definition of racial balancing. There is no support in any case law for understanding that as racial balancing or as impermissible intent generally. There is none, none whatsoever. If it were the case that it was considered racial balancing, then, for example, the University of Texas top 10 percent plan would be unconstitutional racial balancing. I acknowledge that the Supreme Court did not hold that that plan was fine in Fisher, but it clearly endorsed that as an appropriate race-neutral alternative to providing racial preferences in admissions decisions. Even Justice Scalia and Justice Thomas in their dissents in Fisher pointed to that as a way to improve diversity, quote, without discrimination, unquote. When the board said in its resolution the goal is to have TJ's demographics represent the NOVA region and the demographics that the board had seen, there was a breakdown by percentage of race in the NOVA region, I guess I'm wondering where do we, you're asking us to read that and say, well, that's not a reference to matching the demographics. It doesn't mean achieving a certain percentage. It means something else. But if it meant achieving a certain percentage, would that be an impermissible purpose? I just want to focus on that document. The very next page of that document says what the board is talking about is socioeconomic considerations. It's one of many. I guess even putting aside the document, we can read the document in context. Again, that's a factual dispute. I just want to ask the legal question. If the goal is to match demographics which have been broken down by percentage, would that be, and if they came out and said that very clearly, putting aside what we actually have here, this is a hypothetical, would that be an impermissible purpose? I think looking at that document, of course, it was about a different proposal.  I'm asking you a hypothetical document. Imagine a document that says our goal is to match the demographics of the region, add in even racial demographics of the region, and there's a pie chart showing the racial demographics of the region with the percentages. Is that an impermissible purpose? I think you can't do what Fisher says you can't do, which is to specify percentages and then adopt a proposal that gets you to those percentages. Right. But here, again, I'm asking, is that an impermissible purpose, even if you then go on to adopt a neutrally, facially neutral policy? Because we're here on an intent claim. Respectfully, you have to look at what the board actually did. And what the board did, first of all, it had a resolution. There were four resolutions altogether, weren't there? That's right, Your Honor. And only one was adopted. That's correct. So is that a yes or a no? Only one. So the answer is, and I apologize, I don't think you can answer cleanly yes or no, because it's always going to depend on surrounding context. And surrounding context here is critical. What they did was adopt a resolution saying they were not engaging in racial balancing, they were not targeting. If one looks at what they actually did, they adopted it. I'm just trying to find out as a legal matter. Take a hypothetical as a legal matter. Our stated purpose is to match the demographics of our area. Here are the demographics of our area. X percentage African American, X percentage white, X percentage Asian American. Is that an impermissible purpose? If you disembody it and consider it all by itself, then I think it can be considered an impermissible purpose. But that isn't this case. One has to look at what the Board actually did. The Board took an official action and it repudiated racial balancing in the resolution. And it adopted an approach which no reasonable person can understand as racial balancing. Mr. Varelli, you and Judge Rushing have had an extensive discussion about how to interpret various documents. But for purposes of reviewing the district court's actual holding, don't we have to construe all the inferences in your favor? The district court granted summary judgment in favor of the plaintiff. Yes, certainly. Certainly with respect to the coalition's motion, that's absolutely right. Which is what the district court granted, right? That's the motion. That's absolutely right. I guess what I'm trying to suggest is that the idea that this was an effort to do what the district court described it as, which is to align admissions percentages with the demographics of the county, is not just wrong, it's completely unreasonable. Just look at the numbers. Asian Americans are 19 percent of the county population, 54 percent of the admissions. They may have done it poorly. In McCrory, African American voting increased after the legislature took the actions that our court said were intended to discriminate and prevent African American groups from voting. So it's absolutely relevant. You're right, we cannot look at this in a vacuum. But I don't know that the fact that it didn't match up exactly solves everything. It's one factor. I think it goes way beyond that, Your Honor. I think this is an Occam's razor situation. One possibility is that they were trying to accomplish that and they were completely incompetent and they missed it by a million miles. The other possibility is that they weren't trying to accomplish that. That is by far the clearer explanation for what happened. Is that a question for a fact finder? No, it's clear on the face of it, Your Honor. There is an official board resolution saying we aren't doing it. The policy isn't designed to do it. The policy didn't accomplish it. So if you look at all of those facts, those are the material facts. If you put all those material facts together, there is no reasonable basis for concluding under any circumstances that this is racial balancing. It just isn't. I do think that that is the key problem with the case that my friends on the other side are advocating here. Their theory really comes down to this zero-sum idea. It's really not a racial balancing case because there is no record support for that. This is a case where their argument comes down to the proposition that in any situation in which there are a limited number of opportunities, so government employment, government education, government contracting, et cetera, any effort on the part of the government to improve opportunities for historically underrepresented groups will necessarily violate the Equal Protection Clause because it is foreseeable in those circumstances that it could reduce opportunities for other groups. That is a radical, radical notion. There is no support in any case for it. They haven't identified any. It would be completely inconsistent with the endorsement of the top 10 percent plan in Fisher, with the endorsement of small and disadvantaged business set-asides in Croson, on and on and on. Well, foreseeability is obviously not enough. Feeney says it has to be because of, not in spite of. Right. Their whole case depends on that and it is wrong as a matter of law. That is why what they describe as racial balancing really is just another version of making their zero-sum argument. What they are saying is it is racial balancing because you are moving some numbers one way and some numbers the other way. Racial balancing, as a matter of law, means something very, very different. The Board did not and there is not a basis in the record for concluding that it did engage in that kind of conduct. If I could just make one point about McCrory. Your Honor made a point about McCrory that I actually wanted to make. You are welcome. On page 232 of the opinion, the Court notes that actually African-American participation turnout went up under the new system. The District Court, mimicking the argument that my friends on the other side made, was that McCrory endorses what the District Court said and what they said is a simple year over year comparison. That very point that Your Honor made demonstrates that they are completely wrong about that because if it were a simple year over year comparison and turnout went up, they would have no disparate impact claim. That is the argument. Our Court's response was, well, but there is other evidence of disparate impact that came before. Then we said, and look at the rate of change year over year. We looked at year over year, but we looked at the rate of change rather than the turnout itself. In different cases, why can't you look at it different ways? Two points about that. I actually think the prior page 231, which remarkably my friends on the other side cite, is the key page in McCrory. What that page says is that within the confines of the newly adopted electoral system, African-Americans are disproportionately disadvantaged as compared to other races. That is exactly the disparate impact test of Wards Cove and Hazelwood that we are advocating for. I think it is clear on page 231 in the opinion that that is the test that this Court applied. We didn't adopt a Title VII test for the Equal Protection Clause. Once again, just as with their zero-sum theory, there is no case law adopting their simple before, after comparison as a basis for disparate impact. It really can't be because if you think about disparate impact that way, then any governmental change is going to be liable to a disparate impact attack. This is not a disparate impact claim. This is a discriminatory intent claim. We are talking about equal protection. It is not enough to have the statistics. You have to have evidence of intent, which is quite difficult. Their argument is that that kind of discriminatory intent, the desire to discriminate against Asian-Americans, can be inferred from the disparate impact. What they describe is a disparate impact. But there isn't any disparate impact in the way that the law understands disparate impact. That is not to say they might, in a different case than this one, a party might be able to point to direct evidence of that kind of animus to prove a case like the one they want to prove, but you don't have anything like that here. As I said, if you look at page 56, they concede that they don't have that evidence and that their argument is the zero-sum argument, that the discriminatory intent is, in their words, necessarily implied by the fact that this is a zero-sum situation. We want you to reverse the District Court's judgment of summary judgment for the Coalition and direct the District Court to enter summary judgment on our cross-motion because we believe there is no material dispute of fact under the correct understanding of the Equal Protection Law. I know I have gone way over my time.  That is fine. As long as you get questions. I don't mean if there are any other questions.  Any other questions? Thank you very much, sir. Ms. Foster, you represent the United States of America? That is right. Sidney Foster for the United States. Good to have you with us. Thank you very much. It is nice to be here. I wanted to start by thinking about the consequences of the theory that the Coalition is advancing and that the District Court adopted. It makes no sense to conclude that promoting equal opportunities is a suspect purpose because it would inappropriately freeze in place the status quo. Imagine we had, for example, a school district that was operating an elite, selective public school that happened to be nearly all white. Imagine that the school district came to realize that some of its policies were precluding many qualified students of color from gaining admission. Maybe it had a steep admissions fee or something of that like. It can't be the case that the Equal Protection Clause forbids the school district from addressing that problem, thus freezing in place this situation in which individuals of all races are denied equal opportunities. Yet, that is the consequence of the District Court's decision. It forbids school districts from taking a look at the racial demographics of the students who are taking advantage of a public resource that they're offering. Then, when they discover that there's a problem with equal participation, taking measures to rectify those barriers to equal participation. That simply can't be the law. This is the example I thought of. Doesn't it suggest that the Commonwealth of Massachusetts would have been forbidden from repealing the veterans' preference at issue in Feeney? Because, say they noticed, you know, turns out this veterans' preference overwhelmingly benefits men and prevents women from getting jobs in state government. So, we're going to get rid of it in part because of that. And we're not going to have a pro-women policy. We're going to just have a policy that says no more veterans' preference. Why wouldn't men in Massachusetts have been able to make precisely the same argument the coalition makes here? That's exactly right, I think, Your Honor. And I think it underscores why that can't possibly be the right decision. It can't be the case that every time a public entity declines to, you know, adopt a policy that would be, you know, if there's a policy, it goes both ways. If there's a policy that is inequitable, a state, a public entity needs to be able to address that problem and rectify it if it discovers a barrier that it wishes to fix, as in Massachusetts. It goes the other way as well. If a state or public entity already has policies that it deems to be equitable and ensuring that they ensure equal participation by individuals of all races, it wouldn't make sense to apply strict scrutiny each time that public entity decides not to adopt some kind of proposal that it views as denying equal opportunities. That would simply make no sense. There's a degree to which there's a baseline problem here, which just underscores yet another problem with the coalition's argument. I just wanted to briefly address the racial balancing issue as well. I think there are different definitions of racial balancing going on here. Racial balancing, as the Supreme Court has defined it, is a preference for a specified percentage of a particular racial group merely because of race. And as Mr. Gurley was just explaining, most race-neutral policies simply aren't designed to achieve any particular... Do you agree that racial balancing, as you just defined it, can be a purpose and not just a manner of executing a plan? I was confused in the briefing whether you were saying that racial balancing is only about the way the plan is designed, right? You can never have a facially neutral plan that's designed to racial balance. Or do you agree that you can have a facially neutral plan that has the purpose of racial balancing as you define it? So we think that, as a matter of fact, most race-neutral plans aren't going to have that purpose. That's because most of them are designed to achieve a lot of different kinds of purposes. They also typically rely on factors that, by their very nature, are not correlated perfectly with race. You could imagine perhaps a hypothetical race-neutral plan that is actually capable of achieving particular numerical benchmarks. Here, for example, you could imagine if the school board had adopted a lottery that could potentially be designed to achieve particular numerical benchmarks. But it still would not be racial balancing as the Supreme Court has...  I was just going to offer a hypothetical, but again, it's not what's happening here. Geographic lines are an example of facially neutral factors that are used to set policies that can have intended racial balancing effects. We see that in cases in a different context. Right. Well, they can at least affect racial demographics. Again, it's not... And they're often done for that purpose. Right. Exactly. And the Supreme Court, though, has sanctioned that over and over again. Justice Kennedy's opinion in parents involves sanctioning drawing school attendance zones with racial demographics in mind. That opinion was cited favorably in inclusive communities by the whole court. So we have multiple examples where the Supreme Court has sanctioned that. I won't go through them all. They're all in our brief. But I do want to make a critical point about a school district that does... If I have time, I see that I'm over. But a school district that does adopt a race-neutral policy is capable, perhaps, of attaining a particular numerical percentage. Even then, the policy would not be racial balancing as the Supreme Court has defined it because racial balancing, as the Supreme Court has defined it, is a preference for a particular percentage merely because of race. So, for example, in Croson, the Supreme Court said that the 30% set aside for minority-owned businesses was problematic because it wasn't correlated with what we would expect in terms of the number of minority businesses that would be participating in the market. But when you have a public entity, like a school board, that is trying to decide how, if it's distributing a public resource in an equitable way, in a permissible way, it's evaluating who's taking advantage of that resource. It makes perfect sense, and it should be permissible for that school district to take a look at the demographics and look at who is taking advantage of that resource. Does it reflect the racial demographics of the larger relevant community? And when it identifies significant disparities, the school districts need to be able to address those disparities, removing unnecessary barriers to equal participation. Thank you very much. Thank you. I appreciate your help. And Ms. Wilcox, you represent the board? No, you represent Coalition for TJ. Yes, Your Honor. The other side of the board. Good to have you with us. Thank you. Good morning, and may it please the Court. My name is Erin Wilcox, and I represent the Coalition for TJ. Racial discrimination by proxy is nothing new. It's been on the Supreme Court's radar since Yick Woe, and courts have had an analytical framework for rooting it out since Arlington Heights. The district court applied that framework to the undisputed evidence in this case and concluded that the Fairfax County School Board changed the TJ admissions policy in order to disproportionately burden Asian American children. There is no reason for this court to disturb that ruling and continue to subject hundreds of Asian American children to an application process that discriminates against them because of their race. So you want us to affirm the district court? We do, Your Honor. Do you all still subscribe to the proposition that you want to increase unrepresented minorities at TJ? I'm sorry, Your Honor, could you repeat that? Do you all, that's your client, continue to support the proposition that you want to increase the numbers of unrepresented minorities at TJ? Are you referring to the Coalition's second look plan, Your Honor? Well, let me try this. At J2368, the Coalition said in a deposition, quote, we all support increasing diversity of black and Hispanic students at TJ. That was your client that said that in a deposition. Does your client still believe that's correct? Of course, Your Honor. Our client supports equal opportunity. No, no, no. I didn't ask if you supported what you call equal opportunity. I asked if you support increasing diversity of black and Hispanic students. As long as that does not adversely impact and make it more difficult. You made a proposal. You made a proposal to the board. It's in the record here. That's called the second look program. Would materially increase both the geographic and socioeconomic diversity at TJ. You wanted to increase unrepresented, right? The unrepresented minorities, you said. That was your proposal. It related to an earlier proposal before the board. I understand that. But did you all urge them to do what you're now challenging that they did, basically, or claiming that they did? Not exactly, Your Honor. You're speaking with what they used to call, back in the Indian Wars, a fork of tongue. You take one position and the smacks of judicial estoppel or administrative estoppel or something. If you take a position and then you, when another proposal is adopted that does pretty much what you wanted or said you wanted, you challenge it and say it violates the Constitution of the United States. No, Your Honor. We disagree with that. We don't like to be treated that way. Your Honor, the second look proposal was first a compromise that the coalition was putting forth to the school board in an attempt to stop them from the obvious discrimination that they were headed towards against Asian American students. That was made clear from, really, the very beginning in the summer of 2020, that that was the direction the board would be heading, was attempting to have fewer Asian American students at TJ to make room for more black and Hispanic students. That's clear in the record from the statements that the board members and other senior staff in Fairfax County Public Schools made. The Asian American students were in the way. They needed to clear out room to increase the numbers of black and Hispanic students. Ms. Wilcox, can I just ask? I don't think I got an answer to this question. I'm going to read this sentence again, and I'm going to ask you yes or no. Does your client still agree with this sentence? Quote, we all support increasing diversity of black and Hispanic students at TJ. Does your client still believe that? Yes, Your Honor, but not if it limits opportunities for anyone based on their race. Okay, so then I want to ask you about something else, which strikes me as the crux of the district court's reasoning. Where the district court said the board's policy was designed to increase black and Hispanic enrollment, which sounds an awful lot like what your client said it endorsed, which would, by necessity, decrease the representation of Asian Americans. How is that possible to square with Phoenix? Your Honor, we're in a zero-sum environment in a school like TJ. In other words, it's not possible to increase the representation of one group without decreasing the representation of another in this zero-sum environment, you're saying? Yes, Your Honor, that's the very definition of a zero-sum environment. So that means that any attempt to increase the representation of one group, in your view, by necessity discriminates against another group, by necessity triggers strict scrutiny. No, Your Honor. Why not? Let's think of this like a scale. Can you intend to put a weight on one side of a scale without intending that the other side will go up? No, that doesn't make any sense. So in a zero-sum environment, can the school board intend to change the demographics, increase the representation of one group, without necessarily taking away seats from the group that it believes is overrepresented? Let me ask you this. How could, because again, you've said that you support the goal of increasing the diversity of black and Hispanic students. How could the board achieve that goal in a way that you don't think is unconstitutional? Your Honor, it could take any number of steps that do not disproportionately burden one race. It could, for example, enact a lottery. The board rejected a lottery because they said, as board members quoted in the record, that's not going to give us the diversity we need. It could offer free test prep if it's going to maintain a test. It could get rid of the TJ Magnet program altogether and make it just a regular high school. But any step that it takes that does not disproportionately burden a group of students because of their race would pass constitutional muster. So let me ask you the question I asked the federal government then. If the Commonwealth of Massachusetts, having one Feeney, decides, you know, I mean, thank goodness the Supreme Court said it wasn't unconstitutional to have a veteran's preference. But they kind of raise good points that this really, really, really disadvantages women and results in almost no women working for the Massachusetts state government. So let's get rid of the veteran's preference. Why can't a class of men in Massachusetts challenge that on equal protection grounds that are literally identical to the one you're bringing here? Because eliminating the veteran's preference for everyone, eliminating it for men and for women, treats everyone equally. But that's what the board did here. They eliminated the tests for everyone. They changed the GPA for everyone. They raised, they eliminated the application fee. The policy on its face is exactly the same as to everyone. Yes, Your Honor, but then they implemented a 1.5% middle school allocation and bonus points for experience factors that were precision. They were strategically targeted at eliminating seats that were given to Asian American students. And they did, in fact, have that effect, spectacular effect. They dropped 19 percentage points in one year. So that is, they went beyond simply eliminating a test for everyone, eliminating an application fee for everyone. They then implemented measures that did not treat all students equally based on their race. Are you conceding that if it wasn't for this 1.5% per school, you would think this plan is constitutional? I rather suspect you would not. No, Your Honor. The 1.5% allocation as well as the bonus points that are awarded, the experience factors in the policy, those all combine to treat Asian American students unequally compared to other students. So, Your Honors, another aspect of the Arlington Heights inquiry, obviously this is a facially race-neutral policy. No one disputes that. But contrary to what this board would like this court to believe, that doesn't end the inquiry. A policy is not race-neutral. It's not non-discriminatory just because it says it is on its face. And it's not non-discriminatory just because it claims to help some groups of people. What you say is that the resolution that says it's race-neutral was false. That the board approved a false resolution. Your Honor, the entire point of Arlington Heights is to look beyond facially race-neutral laws or resolutions and get at what you... The board adopted that, I think, 10 to 1 or something. I'm sorry, Your Honor. The board adopted that by like a 10 to 1 vote. They say they adopted a resolution that says race-neutral. And you say that's a falsity. In this case, Your Honor, that resolution is not race-neutral. As we know, based on the district court's analysis and analysis of the facts in this case, that that resolution, that policy, does in fact discriminate against Asian-American students. They didn't study to see what the effect of it was going to be on race basis beforehand, did they? Your Honor, they did modeling on a previous... No, that was another proposal. I'm talking about on this one, the one they adopted. Yes, Your Honor, but the board, when they made that decision, when they voted, I believe all but two people voted in favor of that decision, they had school-level data on TJ applicants by race and who would receive, who would be, they had school-level data on race and who would be eligible for admission to TJ. And so they had all the information they needed. They had previous modeling that was eerily accurate to what ultimately happened, and they also had all the data they needed to make that decision. But wait, wasn't that modeling for a plan they didn't adopt? It was, Your Honor, but it was still... The modeling we can infer they intended to discriminate because they had data for a plan they didn't adopt and no data for the plan they did adopt? They did have data for the plan they did adopt, Your Honor. They had data and... But the modeling you're referring to is for a plan they didn't adopt. The pie charts were for an earlier version of that plan. The school-level data and eligibility and broken down by race and eligibility was applicable even, it's just applicable at school-level data. Can I ask you another question about how intent and impact intersect here? Do you think that under our precedent, when you have a facially neutral policy, I'm not talking about a facially race-based policy, when you have a facially neutral policy, can you state an equal protection claim without having discriminatory impact? I'm sorry, Your Honor, could you repeat that question?  So again, I'm not talking about a students for fair admission type plan. I'm talking about a facially race-neutral policy. In that bucket, to state an equal protection claim, do you need disparate impact in addition to discriminatory intent? Your Honor, in this circuit, you do not need a great deal of disparate impact. If you look at McCrory, the court in that case said there was surgical precision and the disparate impact they found in McCrory was not gigantic. But it's certainly one of the Arlington Heights factors along with... I'm not asking if it's one of the factors. I'm asking if in this circuit you have to have at least some. And when I look at Raymond, it seems to pretty much flat out say, I mean, I'll just quote it. It says, to prevail on the merits of their challenges, the challengers had to prove that the law was passed with discriminatory intent and has an actual discriminatory impact. Do you agree that that's the law of this circuit? I'll agree that that's the law of this circuit, and I will argue that we have shown plenty of discriminatory intent, sorry, disparate impact in this case. Can I ask you then one question about something I noticed in your briefs? So in your briefs, you repeatedly say that the board's goal was to decrease enrollment of overrepresented Asian Americans. And over and over again in your brief, you put that word in quotes. And then I started wondering where that word comes from. And I don't see anywhere in the joint appendix where the board used the word overrepresented to refer to Asian Americans. Usually when your briefs does it, there's no citation whatsoever for where that language comes from. Could you point me to a single instance in this record where the board mentioned overrepresented Asian Americans? I'm not aware of one, Your Honor. I'm sure if we find one, we can let you know. But I believe that we're using overrepresented in quotes because we don't believe that a group can be overrepresented. So that's your, so those scare quotes you're not asserting are the board's scare quotes. Those are your scare quotes around overrepresented. Yes, Your Honor. Yes, Your Honor. And Your Honor, just to... You're there for argument purposes. Yes, we are arguing in that brief and we are arguing that a group cannot be overrepresented. Lawyers can do that. Go ahead. We love our scare quotes, Your Honor. Your Honor, just to circle back a little bit to the question of modeling, modeling on the previous plan versus modeling on the plan that was adopted. Your Honor, there has never been a point system. This experience factors point system in the TJ emissions policy before. Modeling was what, on the first proposed plan? Yes, sir. It was in the September plan. And this, the one that was adopted was the fourth proposal? Yes. And the only one adopted? Yes, that was the plan that was adopted in December. There wasn't a points plan previous to that. That was something that the... They studied it over, what, a few months? The studies and the discussions went on for a period of time? Yes, Your Honor. The discussions went on. They started in September. September, I think, 15th was when the first presentation was made to the board by the superintendent at that time. The board voted in December 17th. So it was a fairly quick process, all things considered. And, you know, I will talk a little bit about, in my quickly diminishing time, how unusual that process was. And as the district court pointed out, it was rushed and shoddy are the words that he used. What's the relevancy of all this prior stuff? Don't we have to focus on what was adopted and what they did in adopting it? What it says? Your Honor, it all informs the process, or the policy that was ultimately adopted. And it starts back in the summer of 2020 when race was in their minds from the forefront. Race was in the minds from the minute that the admissions numbers came out from that year in June of 2020. George Floyd had just been murdered. These admissions data came out. There was uproar. There were board members promising intentful, impactful action, saying that the admissions numbers for TJ that year were not good enough and they were going to take action to change it. And it developed from there. They had, what, 18 out of 26 junior highs that weren't represented? I believe that's the correct number, Your Honor, but that's because several of those schools... They would have been the underrepresented group. Those schools... Some of those schools would have been, Your Honor, because many of them were not feeder schools. They were not advanced schools. If there's such a thing as representation, meaning somebody's there, if 18 of them have nobody, the 18 of them are underrepresented. Well, Your Honor, I don't believe 18 of them... And then they adopted the, what, 1.5% possibility or something, right? I don't believe 18 of those schools had nobody, but they didn't send as many students as the advanced academic centers, which drew students from their neighborhoods into these concentrated schools. I thought they came from, like, 8 of the 26 schools of the junior high. But anyway, you go ahead. I don't mean to... Well, Your Honor, I'm out of time, I see, so unless there are further questions, we would urge this Court to affirm the decision. I have one. Yes, sir. So, Ms. Wilcox, I agree that under Arlington Heights, a rushed and shoddy process is a factor the Supreme Court has said we've had to look at. It is my sense, and I'm genuinely asking this, it is my sense that when the courts have talked about a rushed and shoddy process, they're usually talking about, like, a plan is announced and, like, they vote the next day. My sense is, I totally understand that your clients would have preferred this process to be longer, but my sense is that a multi-month process with multiple white papers is not exactly in the heartland of cases where courts have referred to the rushed and shoddy process. What do you think is the closest case to this one where courts have relied on that factor, the rushed and shoddy process? The ones I'm thinking about were, like, we announce the text of the bill and we vote that night, or we announce the text of the bill and we vote two days later. What's the closest to the facts of this case where a court has relied on that factor? Well, Your Honor, in our briefing, we're not arguing necessarily the time. I know the district court said rushed and shoddy, but what we're taking issue with in our briefing is lack of transparency that even board members, let alone the public, are saying, we don't know what's being voted on. When the board eliminated the TJ test in October, nobody knew that was happening. That's maybe an argument that they could have done this better as a matter of sort of administrative procedure, but I guess under the Equal Protection Clause, the reason rushed and shoddy process would be relevant is as indirect evidence that they were doing something nefarious or with ill intent. And I'm trying to think of a case that basically relies on, I wish it would have been more transparent, I wish it would have been more thorough, where a court has said that is evidence of an unconstitutional intent.  Yeah, Your Honor, I think we're going to stand probably on McCrory, but really on our point that it's not as a matter of... But then in McCrory, the text of the bill was announced three days before it was voted on. That's true, Your Honor. I really just want to point to, as we say in our briefing, just the lack of information, the fact that there were more meetings held to rename two schools than there were to change this admissions process for this elite high school in Fairfax County. So that's really, I think, where we're at in the rushed and shoddy process. Thank you. Thank you very much, Ms. Wilson. Ms. Wilcox, we appreciate you. Mr. Ferguson, you represent the Commonwealth of Virginia. That's right, Your Honor, and 15 other amici states. Good to have you with us, sir. Thank you, Judge King. You mean 15 others have joined your amicus brief? Pardon me, Your Honor, I'm sorry? There are 15 other states that have joined your amicus brief. That's right, Judge King. We have another group of attorneys general on the other side. What's their number? I think it's around the same. It's safe to say the country's split on the issue. We've got lots of states' attorneys general filing papers here. We appreciate it, though. That's right. It's good to have you here. Thank you, Judge King. Good morning, and may it please the Court. I would like to address one limited issue in my time this morning. This appeal will turn in large part on how to measure whether the school board's new admissions policy had a disparate impact on Asian American applicants. The amici states have an important interest in the resolution of this question, given that all states play a critical role in guaranteeing the application of the 14th Amendment in their schools. The amici states agree with the coalition that the proper impact analysis in a case like this one can be to compare the rates of offers made to Asian American applicants before the new policy was implemented and the rates made after, for three reasons. First, it's consistent with the anti-circumvention principle that Arlington Heights embodies. Second, the school board's parade of horribles about this form of analysis are overwrought. And third, it's consistent with McCrory. Beginning with anti-circumvention, the Equal Protection Clause requires that the state treat the citizen as an individual and not as a component of a racial group. It therefore prohibits laws that have the purpose of discriminating on the basis of race. That guarantee would mean very little if it were limited to laws where the purpose appeared exclusively in the face of the statute. Arlington Heights and McCrory serve a critical anti-circumvention function. They prevent the government from making decisions motivated by discriminatory purpose, irrespective of whether the purpose appears on the face of the statute. The disparate impact prong of Arlington Heights should be interpreted in light of that anti-circumvention principle, and we think that it favors the coalition's position. The 14th Amendment forbids schools, or school boards, or any educational institution that wants to promote diversity from trying to promote diversity by seeking a particular number or quota or aiming for a particular number. Mr. Ferguson, can I ask you the same phony hypo-ask to other people? Under this theory, why wouldn't it be a constitutionally disparate impact if Massachusetts eliminated its veterans' preference? Because disparate impact would not itself be sufficient to establish the 14th Amendment. Okay, so in your view, there would be a constitutionally relevant disparate impact, though. That class of plaintiffs has stated the disparate impact element in your view. I think it would be relevant to the analysis of whether an acting legislature was motivated by an invidious purpose, and I don't think that's particularly surprising. And if I can just jump to the McCrory issue very quickly. McCrory, with respect to my friend on the other side, McCrory didn't hold that this sort of analysis was forbidden. It said it isn't required to state an invidious purpose claim. Because as Judge Rushing said earlier this morning, in McCrory, black participation rates in subsequent election went up by 1.8%. And the district court held, well, clearly there couldn't have been disparate impact because voter participation went up. And the court said, that's far too onerous a burden to require a party to show disparate impact. But it doesn't follow from that that that can't establish disparate impact. It might not be necessary, but it is certainly relevant. And I think that that's the problem with the argument of my friend on the other side. Their argument is that the 14th Amendment excludes consideration of the status of one racial group before a policy was changed and afterward. That simply can't be correct. It sort of defies common sense. And so I think that the importance of interpreting it that way is to keep it consistent with Arlington Heights. The point of Arlington Heights is, you can't do tacitly what the Constitution forbids you from doing expressly. And I think there is a danger. It wouldn't apply in every case because we're talking about purpose, which is a sensitive multi-factor analysis, as the court said in Arlington Heights. But we run the risk if we say that it is constitutionally irrelevant what was going on before a policy and after the policy change, that states could hide attempts to use quotas or attempts to achieve racial balancing in facially neutral language. And as long as they kept their quotas underneath the proportion of the population, under this analysis, they would be fine irrespective of what happened after the policy change. And I simply think that that can't be correct. Mr. Ferguson, does the Commonwealth of Virginia and those other 15 states think the Texas 10% plan is unconstitutional? Two responses to that, Your Honor. First, the 16 states represented here do not take a position on it. And second, I don't think it's relevant here because there's no doubt that the Texas top 10% plan was facially neutral, so it would be subject to the Arlington Heights analysis. There's also no serious doubt in the world, as a person who was alive when this happened, that it was enacted in significant measure to prevent black and Hispanic enrollment at the University of Texas from collapsing in the wake of Hopwood. There is no serious argument that that was not one of the things the Texas legislature was trying to do. Do you contend otherwise? Judge Hines, I was also alive during the top 10%, but I will defer to your view on that. But it was unequivocally a part of Justice Kennedy's opinion in Fisher II that for reasons that aren't clear from the record, the plaintiff had decided not to challenge the top 10% plan, and so no one addressed it. And with respect to my friend on the other side, the brief references to it in Justice Scalia's and Justice Thomas' dissent did nothing approaching an Arlington Heights analysis, and I just don't think it tells us anything about whether it's constitutional. And certainly the amici states don't take a position on it today. I see that my time has expired, so unless there are additional questions, the amici states ask that the judgment of the district court be affirmed. Thank you. Thank you, Mr. Ferguson. Mr. Borrelli? Thank you, Your Honor. A few points, if I could. I want to start with the experience factors which the coalition raised as an implementing force for this discrimination. There's only one experience factor that they identify in their brief and only one on which the district court relied, and that's the underrepresented schools factor. I think it's worth looking at the facts of that because I think it exposes what's really going on here. Now, the underrepresented schools factor, by definition, applies only to the 100 unallocated seats in the system because if you're going to an underrepresented school, 100 percent of the people get the credit for it. If you're not, 0 percent. So in competition for the 1.5 seats, it has no relevance. It applies only to the unallocated seats. Now, there were 88 unallocated seats in the year challenged here. 81 of the 88 went to students in the feeder schools, in other words, not underrepresented schools. So we're talking about seven students. We don't even know the race of the seven students. They could all be Asian American for all we know. The district court described that as a significant discrimination against Asian Americans. And with all due respect, it's ridiculous. We're talking about seven students. We've gone through with respect to the other factor, the 1.5 percent factor that they've relied on, and we showed in our brief that there are many, many non-feeder schools that have comparable Asian American percentages to feeder schools. And what this gets to, I think, is a fundamental point with respect to the argument they're making, even about disparate impact, is that even if one were to concede that disparate impact year over year of the kind that they are arguing for is relevant in this analysis, you have to show it by statistically significant proof. You have to isolate out the factors you're challenging and demonstrate that they were the causative element. That's what the Supreme Court said in Watson. That's the law in this area. Isn't Watson a Title VII case, where you can make your entire case just by showing disparate impact, right? There's no requirement of additional factors to show intent. Is a different standard or a less onerous standard for disparate impact applicable in equal protection context? So what I guess I would say about that is that you haven't proved disparate impact unless you have shown it by statistically significant evidence, whether it's for Title VII and dispositive or in this context and relevant. And certainly, I'm just curious about, you know, you talk about in your brief about eliminating the other factors and showing causation and, you know, all the analysis that's necessary. And, you know, that's certainly not what we require in McCrory. And I haven't seen that in the equal protection jurisprudence because there's other evidence of intent. Now, certainly, you see that in Title VII because you can have a standalone disparate impact claim. And I wondered if your position is, which it seems to be, that the requirements for a standalone disparate impact claim apply to a discriminatory intent claim under the equal protection clause. I'm going to say it a little differently. I'm not trying to dodge Your Honor's question. No, sure. But I think you have to prove causation. And if you haven't got statistically significant proof, you haven't proved that the thing that you're complaining about caused the result that you claim is discriminatory. Did the McCrory plaintiffs have statistically significant causation proven? I don't know whether they did or not, Your Honor. Did the court mention it? No, Your Honor. But I think in this context, when what you are talking about, what they're claiming is two things, 1.5 percent and the underrepresented school factor, caused the drop in the Asian American numbers, as opposed to, say, the massive increase and change in the demographics of the applicant pool, 900 more people. They didn't prove what they set out to prove here. I think that's the key point. If I could, just a couple of other points before I wrap up. One is, in terms of this, this is one really salient fact. I want to make sure it doesn't get lost here. The argument here is that this plan intentionally discriminates against Asian Americans. What this plan, in fact, does is remove socioeconomic and geographic barriers that affect people of all races, Asian American, African American, Latino, white, mixed race people. Striking proof of that is this undisputed fact. In the year before the adoption of the new plan, one low income Asian American was admitted to TJ, one. In the year after, the number was 51 Asian Americans. Now, I point out, that number is higher, the 51 low income Asian American number is higher than the total number of African Americans admitted under the new plan, which is 39. It is very close to the total number of Latinos admitted under the new plan, which is 62. I think that should give the Court a little perspective on the allegation that what this plan was designed to do is discriminate against Asian Americans. What this plan was designed to do was to remove socioeconomic and geographic barriers that held back people of all races, including African Americans and Latinos. That was one purpose, and we don't deny it. But it benefited all races. I think that tells you what you need to know about whether or not this was a plan that was adopted for the purpose of discriminating against Asian Americans. Thank you. Thank you, Mr. Verrilli. The case will be submitted. We very much appreciated the arguments of counsel. It was good to have you here. If we were operating under normal rules, we'd come down at this point and visit with you at the well of the Court. But we're not going to do that today. We'll do that next time. Good to have you here.
judges: Robert B. King, Allison J. Rushing, Toby J. Heytens